Statement of Facts.

[No. 3845.]

## CHARLES H. SAWYER *v.* THE CITY AND COUNTY OF SAN FRANCISCO.

NOTICE OF INTENTION TO MOVE FOR A NEW TRIAL.—Under the practice before the adoption of the Code of Civil Procedure, the party intending to move for a new trial could give notice of his intention to do so at any time within ten days after the opposite party had given him written notice that the decision had been rendered, provided the case was tried by the court and no written findings had been filed.

TAKING PUEBLO LANDS FOR PUBLIC STREETS.— The city of San Francisco, as successor of the pueblo of that name, had the right to take pueblo lands in the possession of others for public squares without making compensation therefor.

ACT-CONCERNING PUEBLO LANDS IN SAN FRANCISCO.—The act of 1858, ratifying and confirming Ordinances 822 and 845 of the Common Council of the city of San Francisco, approved of the map of the Western Addition to said city with the streets and public squares thereon delineated, which was reported by the commissioners appointed by said council, and by said council approved.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The city of San Francisco, as the successor of the pueblo of that name, became entitled to, and had confirmed to it, the pueblo lands, consisting of four square leagues. The city, on the 20th day of June, 1855, passed an ordinance relinquishing to the possessors thereof said lands, with certain exceptions. The ordinance provided that the city should have a right to select and set apart from lands west of Larkin street, lots for school-houses, etc., and might lay out and reserve upon said lands public squares not embracing more than one block, and public streets, and might proceed to lay out the same. The ordinance then provided, that the city should not, without due compensation, occupy, after laying out the streets, more than one-twentieth part of the land in the possession of any one person. Another ordinance was passed September 27, 1855, providing that the Board of Aldermen and Assistant Aldermen should elect three commissioners, to discharge the duties of laying out streets, public squares, etc., prescribed in Ordinance

822, and that the city surveyor should act in conjunction with them. The Board of Aldermen selected as such commissioners, Michael Hayes, C. H. Gough, and John J. Hoff, who made the selection and reported the same, with an accompanying map. Upon the map a plaza, called "Alta Plaza," was delineated, bounded on the north and south sides by Jackson and Clay streets, and on the east and west sides by Scott and Madison avenues, and containing four blocks of land. Ordinance 822 provided that the city should not, after laying out the streets, occupy for lots for school-houses, hospitals, fire-houses, and public squares, more than one-twentieth of the land in the possession of any one person, without making due compensation. The Board of Supervisors of the city, being the successors of the Council, approved of the map, October 16, 1856. The act of 1858, referred to in the opinion, ratified and confirmed and approved of the ordinances and the order approving of the map. The plaintiff, from 1851 forward, had been in the possession of a portion of said plaza, and on the 16th day of January, 1869, commenced this action to quiet his title to the same. The court below gave judgment for the plaintiff, and the defendant appealed.

The other facts are stated in the opinion.

*W. C. Burnett*, for the Appellant.

There was a pueblo of San Francisco, and the city of San Francisco, as successor thereto, was entitled to, and had confirmation of, four square leagues of land, including the premises in controversy (*Hart* v. *Burnett*, 15 Cal. 530), but subject to the right of the people in the public reservations for plazas, etc., forever.

The confirmation was made of such lands in trust for the use of its inhabitants for all time, subject only to alienation by such agents and in such mode as prescribed by law. (*Hart* v. *Burnett*, 15 Cal. 583.)

And the city of San Francisco has only such power of disposition of such lands as is given by statute. (*Payne et al.* v. *Treadwell*, 16 Cal. 220.)

The Common Council had no power to pass Ordinance

882 (commonly called the Van Ness Ordinance), and it was void until the passage of the act of March 11, 1858, and could not pass title. That ordinance was approved by the mayor June 20, 1855. The act of the Legislature to reincorporate the city of San Francisco, approved May 5, 1855 (Stat. 1855, p. 251), did not go into operation until the first Monday of July, 1855 (see Stat. 1855, pp. 284–5), where it is enacted that "the act of May 5, 1855" (there referred to by a wrong date) "shall not be construed to take effect, nor to operate as a repeal of 'An Act to reincorporate the City of San Francisco,' passed April 15, 1851, prior to the election and qualification of the officers provided to be elected under the act first above mentioned." Such qualification of officers did not take place until the first Monday of July, 1855. (See Stat. 1855, p. 252, Sec. 4, and p. 257, Secs. 21, 22.)

At the time of the passage of the Van Ness Ordinance, the act of April 15, 1851, to reincorporate the city, etc., being in force, there was no power to sell or to dispose of the municipal lands.

"All sales or leases of property belonging to the city, shall be by public auction." (Stat. 1851, p. 366, Sec. 6.)

And no matter whether the title of possessors may date by relation to the first day of January, 1855, or to any other time; still it can only be a title to such lands as they were possessed of, exclusive of all exceptions, public squares and reservations. Section 6 of Ordinance No. 822, mentions public squares not to embrace more than one block, but the act of March 11, 1858, refers to a plan and map for the location of streets, public squares, and lots for public uses, to be laid out west of Larkin and southwest of Johnston streets. That plan and map are adopted as one and the same thing, and declared to be the plan of the city in respect to the location and establishment of streets and avenues, and the reservation of squares and lots for public purposes in that portion of the then incorporated limits of said city lying west of Larkin and southwest of Johnston streets, and that order was confirmed. By the plan and map, so confirmed, the public squares were legally made to

include four blocks each.   By adopting and confirming that
plan and map, the Legislature plainly said that the grant of
title to persons in possession was only of such lands as
were not therein and thereon shown to be set apart for
public use.

In the case of a grant by the Government, the construc-
tion thereof is always in favor of the Government, and
against the grantee.

The exceptions, reservations and dedications, in the act
of 1858, and in the order and ordinances therein mentioned,
are first to be considered and held sacred.   (2 Washburn
on Real Prop., marginal p. 524, second ed.)

The terms "reserve" and "reservation," are often used
as synonymous with "except" and "exception," when the
thing to be thereby secured to the grantor is a part of the
granted premises, and when thus used they are to be con-
strued accordingly.   (2 Washb. Real Prop. 640, 645;
*Pettee* v. *Hawes*, 13 Pick. 323, 326; *Hurd* v. *Curtis*, 7 Met.
110.)

This Court, in the case of *Wolf et al.* v. *Baldwin* (19 Cal.
313), denominates these reservations as "exceptions," and
says: "By the second section of that ordinance the city of
San Francisco relinquished and granted all her right and
claim to the lands within her corporate limits, as defined
by the charter of 1851, with certain exceptions, to the
parties," etc.

*H. H. Haight*, for the Respondent.

The intent of the ordinances which were confirmed was
to give title to possessors, reserving to the city the right
to take from each not more than one-twentieth of his land
within six months, for public squares not to exceed one
block in size. ·

This is the municipal legislation or attempted legislation
which the act of 1858 assumes to confirm, without attempt-
ing to qualify the explicit terms of the ordinances.   The act
of 1858, it is true, also assumes to confirm the order of the
Supervisors adopting the map upon which, besides the
streets and school and engine lots, the square in question

was represented, but it seems clear that if the map contravened the explicit language of the ordinances, the latter must prevail. The main purpose of the map was to secure streets and avenues. This object was attained, but the paramount object of the ordinance was to give title to the possessors upon the most uniform and equal basis. Note the strong language of the last section of the act of 1858: "That the grant or relinquishment of title made by the city in favor of the several possessors, by sections two and three of the ordinance first above recited (No. 822), shall take effect as fully and completely for the purpose of transferring the city's interest, and for all other purposes whatsoever, as if deeds of release and quitclaim had been duly executed and delivered to and in favor of them individually and by name, and no further conveyance or other act shall be necessary to invest the said possessor with all the interest, title, rights, benefits and advantages which the said order or ordinances intend or purport to transfer or convey," etc.

With this language and the terms of the ordinances before us, to contend for a construction which might deprive half a dozen individuals of every foot of the land on which they had resided, and nineteen-twentieths of which the ordinances assumed to grant and secure to them, while their fellow-citizens no more deserving escaped any such spoliation, would be in the highest degree unreasonable.

*H. H. Haight and W. M. Pierson,* also for the Respondent.

In this case the commissioners who had the supervision of laying out the streets and squares in the Western Addition, set apart Alta Plaza, and in doing so took for that purpose about *one-fifth* of the respondent's grantor's land. The ordinance under which this power was exercised, provides in the sixth section "that the selection shall be made within six months from the time of the passage of this ordinance; and that the city shall not without due compensation occupy for the purposes mentioned in this section, after the laying out the streets aforesaid, more than one-twentieth part of the land in the possession of any one person." (Stat. 1858, p. 54.)

If, then, the act or the ordinance is susceptible of any intelligible meaning, it means that, by the "relinquishment and grant" made in the second section and by this provision, that the city should not take more than one-twentieth of any one person's land. The excess over the one-twentieth is private property, and the taking of that excess is taking private property for public use; and if the taking of all or a greater portion than one-twentieth can be sustained at all, it can only be vindicated upon the theory, that before the respondent in possession can be compelled to surrender his possession he is entitled to compensation for his property.

By the COURT:

1. The notice of intention to move for a new trial was served in time. The cause had been tried by the court; no written findings had been filed; the decision had been rendered in open court January 3, 1871; notice of intention to move for a new trial was served and filed by the attorney for the city December 31, 1872. The city had the right to give the notice "within ten days after receiving written notice * * * of the rendering of the decision of the court." (Act 1865-6, p. 845, Sec. 6.) No notice of the rendering of the decision of the court had been served upon the attorney of the city at the time the latter gave the notice of intention to move for a new trial, and, therefore, the ten days limited by the statute for the giving of such notice had not run, nor commenced to run.

2. The premises in controversy are a part of "Alta Plaza," and the only distinction claimed by the respondent to exist between this case and that of *Hoadley* v. *San Francisco* (ante, p. 265), consists in the fact that in laying out the plaza in question more than one-twentieth of the land then in possession of Woods and Clayton, from whom the plaintiff derives his title, was taken by the city without compensation made to those persons, as provided in the sixth section of the act of March 11, 1858, entitled "An Act concerning the city of San Francisco, and to ratify and confirm certain ordinances of the Common Council of said city."

It appears, however, that "Alta Plaza" (including the premises in controversy), was delineated (according to its present boundaries), upon the map reported by the commission consisting of Gough, Hayes and Hoff, and adopted by the board as showing the lines of the reservation mentioned in the ordinances referred to. The act of the Legislature of 1858, already mentioned, operated to impart validity to the reservations as defined and delineated on the map reported by the commission. The map, as thus approved by the legislative authority, became the distinctive designation of the public squares *in fact* reserved to the city, and it is of no legal consequence that, in point of fact, more than one-twentieth of lands in the possession of any person was thus reserved without compensation made.

The legislative intention to make the reservation is clear; the failure upon the part of the city to make compensation wrought no injury to private persons, for the city took nothing from them, but only reserved a part of what was already hers.

Order denying a new trial reversed as of the day of submission of the cause in this Court, and cause remanded for a new trial.